PIERCE, Justice,
for the Court:
¶ 1. In November 2008, S. Lavon Evans Jr. and his companies S. Lavon Evans Jr. Operating Company, Inc.; S. Lavon Evans Jr. Drilling Ventures, LLC; and E & D Services, Inc. (collectively “Plaintiffs”) sued the law firm of Baker & McKenzie, LLP, and one of its partners, Joel Held (collectively, “Baker Defendants”) in the Circuit Court of Jones County, Mississippi. The complaint also named as defendants Laredo Energy Holdings, LLC, and its related subsidiaries S. Lavon Evans Operating Texas, LLC, and E & D Drilling Services, LLC. Plaintiffs listed seven causes of action in the complaint. Counts one and seven charged the Baker Defendants with legal malpractice and breach of contract. Counts two through six charged all the defendants with breach of fiduciary duty; negligent omission and misstatements of material facts; civil conspiracy, aiding and abetting; tortious interference; and breach of duty of good faith and fair dealing.
¶ 2. In January 2009, Defendants Laredo Energy Holdings, LLC; S. Lavon Evans Operating Texas, LLC; and E & D Drilling Services (collectively Cross-Plaintiffs), filed a cross-claim against the Baker Defendants in the Jones County Circuit Court, claiming legal malpractice, breach of contract, breach of duty of good faith and fair dealing, and breach of fiduciary duty.
¶ 3. Essentially, Evans asserted that in May 2007, he lost access to his companies’ two largest assets (drilling Rigs 11 and 12) and was sued in Texas by the Baker Defendants on behalf of Reed Cagle (Evans’s business partner), who was acting on be *393 half of Laredo Energy Holdings, LLC (“Laredo”). This triggered a storm of liens and suits by vendors against Evans and his companies — all because, as Evans claims, he made decisions and entered agreements based on advice and recommendations from the Baker Defendants, who Evans believed to be his lawyers. Evans claimed that his businesses once were worth more than $50 million but now were accountable for debts exceeding $81 million as a result of the conduct by the Baker Defendants.
¶4. The Mississippi case was tried in October 2010, and the jury returned a verdict of $108,400,000 in actual damages for Plaintiffs and Cross-Plaintiffs. S. La-von Evans Jr. was awarded $1 million from defendant Joel Held and $30 million from Baker & McKenzie. S. Lavon Evans Operating Company, Inc., was awarded $1 million from Joel Held and $29 million from Baker & McKenzie. E & D Services, LLC, was awarded $1 million from Joel Held and $19 million from Baker & McKenzie. The jury also assessed Evans, individually, with ten-percent comparative fault. And the trial court reduced the $31 million amount awarded to Evans, individually, by ten percent. The Cross-Plaintiffs were separately awarded $22.4 million from Joel Held and Baker & McKenzie, collectively.
¶ 5. After Plaintiffs and Cross-Plaintiffs moved for punitive damages, the trial court held a punitive phase and then submitted the issue of punitive damages to the jury. A divided jury, nine jurors in favor of punitive damages and three jurors against, awarded $75,000 in punitive damages to Plaintiffs and $75,000 in punitive damages to Cross-Plaintiffs.
¶ 6. Plaintiffs and Cross-Plaintiffs were awarded $12,566,348.79 in attorneys’ fees, which included an hourly-rate calculation plus a bonus fee equal to ten percent of the total verdict.
¶ 7. The trial court denied the Baker Defendants’ post-trial motions for judgment notwithstanding the verdict (JNOV), new trial, and remittitur. This appeal followed.
¶ 8. We affirm as to the Baker Defendants’ liability. But because we find the jury was not properly instructed, we reverse and remand for a new trial on proximate cause and damages.
FACTS
¶ 9. Plaintiff S. Lavon Evans Jr. is an oil and gas drilling contractor from Jones County, Mississippi. Plaintiff E & D Services, Inc. (“E & D”) is a drilling company owned by Evans, which provides drilling rigs, workover rigs, trucks, and swab rigs necessary to drill wells. And Plaintiff S. Lavon Evans Operating Company, Inc. (“Evans Operating”) is an operating company owned by Evans, which was responsible for operating, permitting, and producing wells in compliance with state and federal regulatory requirements through the time that the well is plugged and abandoned.
¶ 10. In 1999, Reed Cagle answered an advertisement Evans had placed in the Southeastern Oil Review advertising his drilling services, and Cagle negotiated for Evans to drill oil wells for him in Mississippi and Alabama. Cagle owned Reed Petroleum, LLC (“Reed Petroleum”), and Heartland Energy, Inc. (“Heartland”), and raised money from investors for joint-venture interests, which in turn would contract with others to permit, drill, and operate oil and gas wells. Defendant Joel Held had represented Cagle and Heartland since the 1990s.
¶ 11. Heartland prepaid Evans in an escrow account, and Heartland also han- *394 died certain other costs such as legal expenses. Although Evans allegedly had concerns, he began extending Heartland credit. Evans testified that he voiced those concerns to Held, who told him that he should continue drilling for Heartland.[1] From 1999 to 2006, Evans drilled eighty wells for Cagle and received at least $80 million in payments from him.
¶ 12. In April 2001, the Mississippi Secretary of State, through a subpoena, sought information from Evans Operating in connection with Evans’s involvement with Heartland. Evans then contacted both Heartland and Held. Evans asked Held to represent him, and Held agreed. Thereafter, Evans received an engagement letter on April 20, 2001, from the Baker Defendants, stating:
We are pleased that you have selected Baker & McKenzie to represent S. La-von Evans, Jr. Operating Company, Inc. with respect to a subpoena issued by the Mississippi Division of Business Regulation and Enforcement. The purpose of this letter is to confirm the terms of our representation.
It is anticipated that this engagement will be supervised and principally discharged by Joel Held with the assistance of other Baker & McKenzie lawyers acting under his supervision. We may in our discretion, ask other Baker & McKenzie partners, associates or staff to assist in the discharge of your assignment. As you know, our firm has offices in many jurisdictions and relationships with associated firms in jurisdictions as well. Unless you instruct to the contrary, we will assume that we are authorized to enlist the assistance of lawyers in those other offices and related firms, as appropriate in discharging your assignment.
[[Image here]]
As you know, this Firm will continue to represent Heartland in connection with [sic] respect to the inquiry from Mississippi and matters totally separate and distinct from this engagement. While I do not believe that a present conflict of interest exists, there is potential for conflicts to arise at a future date.
Our representation of clients is governed by the Texas Disciplinary Rules of Professional Conduct, as adopted by the Supreme Court of Texas and the State Bar of Texas. Pursuant to those rules, a lawyer has a duty to exercise independent professional judgment on behalf of each client. When an attorney is requested to represent multiple clients in the same matter, he can do so if he concludes that he can fulfill this duty with regard to each of the clients on an impartial basis and obtains the consent of each client after the explanation of the possible risks involved in the multiple representation situation. While we will represent you and Heartland in connection with this engagement, we nonetheless intend to avoid any conflict of interest between you.
If I conclude that a conflict of interest has arisen between you and Heartland such that I can no longer adequately represent you, I will so inform you and may have to withdraw from representing you. We will continue to represent Heartland. If you believe a conflict of interest has arisen or is likely to arise between the parties or if you believe a conflict of interest has arisen or is likely to arise between the parties [sic], you have a duty to inform the Firm.
Both Evans and Heartland signed the engagement letter. Heartland signed because it would be paying the legal fees.
*395 ¶13. Held visited Evans’s Mississippi office to gather documents and evidence to respond to the 2001 subpoena. Held responded to the subpoena on May 14, 2001, stating that Baker & McKenzie represented Evans Operating and the “Joint Ventures and therefore the venturers.” After speaking with the Mississippi Secretary of State, Held responded to the specific requests and spoke to the Secretary of State’s office again in August of 2001 regarding the subpoena.
¶ 14. According to Evans, a servicing agreement was sent to him in February 2004 by Held’s assistant. The servicing agreement specifically identified Evans Operating and Heartland as the parties. Evans believed that the Baker Defendants had drafted the agreement and structured the deal. The Baker Defendants dispute that the servicing agreement ever was signed. Although he did not retain a signed copy, Evans stated that he signed the agreement and believed he had sent it back to Heartland. Evans alleged that the agreement was effective January 1, 2002, and it confirmed an oral agreement concerning terms of payment.
¶ 15. Under the terms of the servicing agreement, Evans Operating agreed to act as operator of prospects designated by Heartland and to provide services that normally would be provided under similar circumstances. Additionally, Evans agreed to pay the complete cost of the well “from beginning to end.” This differed from the previous arrangement because, under that arrangement, Heartland had been required to prepay the well costs. According to Evans, he operated under the servicing agreement after January 2002.
¶ 16. As per the agreement, Heartland was required to pay invoices “at the rate of as much as $200,000 per month in total for all the invoices ...” unless that payment would render Heartland insolvent.[2] If Heartland was insolvent and could not meet that obligation, the payment would be deferred. The servicing agreement provided that it be continued for five years from January 2002, and it could be terminated with thirty days’ notice. If Evans terminated the servicing agreement, Heartland was not obligated to pay its expenses in full. But Evans’s companies still would be bound by state law with respect to the wells his businesses were drilling and operating for Heartland, even if he terminated the agreement.
¶ 17. Evans avers that he sought Held’s legal advice about the servicing agreement. According to Evans, Held did not tell Evans that he had a conflict of interest or that Evans should get another lawyer. Held allegedly advised Evans to enter into the agreement, and Evans did. Evans stated that when he signed the servicing agreement, he was drilling only one well at a time for Heartland, but in August 2004, Heartland wanted to drill with multiple rigs.
¶ 18. In the spring of 2005, Heartland personnel, Evans, and Held met about acquiring leases from the Los Ojuelos Mineral Trust in Laredo, Texas. Held allegedly negotiated for Evans to take a ten percent interest in the Texas properties leased from the Los Ojuelos Mineral Trust. Under this agreement, Evans was designated in the leases as the “operator” of the wells. According to Evans, Held represented both Evans and Heartland in connection with these leases and wells.
*396 ¶ 19. To accommodate the drilling demands in the Los Ojuelos Mineral Trust, Evans prepared an estimate of the costs to upgrade Rig 11, which was owned by E & D. Heartland wanted Evans to use Rig 11 as collateral for a $5 million loan which would finance the upgrade; however, Evans’s wife refused. When the mortgage plan failed, Heartland advanced about $2 million against receivables owed to Evans in order to upgrade Rig 11 and take it to Texas. Heartland’s $2 million advance paid for portions of the upgrade to Rig 11, which totaled $4,940,664.69.
¶ 20. In September 2005, Alabama regulators inquired about Evans’s business relationship with Heartland and requested Evans provide related documents. Believing that Alabama’s inquiry was a continuation of the Mississippi subpoena, Held responded on behalf of Evans. Two months later, the Mississippi Secretary of State issued a new subpoena, again seeking information on Evans’s relationship with Heartland; Evans called Held to handle the matter. On January 3, 2006, Laura O’Rourke, a Baker & McKenzie attorney, wrote to the Mississippi Secretary of State regarding the subpoena.
¶ 21. In January 2006, Cagle proposed he and Evans go into business together, which would later be formed by the Baker Defendants as Laredo Energy Holdings, LLC (“Laredo”). In response, Evans sent a term sheet that proposed the limited liability corporation be formed in which he would act as manager and own fifty-one percent of the company — giving him a majority controlling interest — and Cagle would own forty-nine percent of the company. Evans contributed Rig 12, which was owned by E & D, as his capital in Laredo. Cagle was to furnish $6.6 million in cash for his interest in Laredo; the funds would be used to refurbish Rig 12 so it could be used in the field to drill deep wells. Evans specifically stated that he did not wish to reduce his partnership below fifty-one percent, nor did he wish to mortgage his equipment or his rig.
¶ 22. While the operating agreement was being finalized, the Baker Defendants were working on a $7 million loan for Reed Petroleum that would be secured by Laredo’s interest in Rig 12. The loan would be through LBK Realty, LLC (“LBK”). Specifically, the Baker Defendants drafted documents for Reed Petroleum to mortgage Rig 12, which was still owned by E & D, even though, as Evans claimed, Reed Petroleum did not have the authority to mortgage the rig, and Laredo and Reed Petroleum did not own any interest in the equipment.
¶ 23. On January 18, 2006, Cagle forwarded to Evans, via email, a copy of the draft LBK loan documents that had been prepared by the Baker Defendants. Ca-gle’s email to Evans included a security agreement between Reed Petroleum and LBK. The agreement stated:
As security for the Obligations, Debtor hereby pledges and grants to Secured Party a security interest in all right, title and interests of Debtor in and to the [insert description of the rig] to which Debtor has any right; title and interest as of the effective date hereof, subject to any limitations thereto (the “Collateral ”).
(Brackets in original.)
¶24. Evans claimed he sought legal advice from Held concerning Laredo, and Jon Carroll of Baker & McKenzie performed the legal work for the formation of Laredo. Held decided to have Laredo formed in the State of Nevada. Carroll prepared and filed the documents for the formation of Laredo as a Nevada limited-liability company on January 19, 2006. Carroll also prepared a certificate of formation for a single-member entity, S. La- *397 von Evans Jr. Drilling Ventures, LLC, which was to own Evans’s interest in Laredo. According to Evans, he relied on the Baker Defendants’ advice as to how Laredo, its subsidiaries, and its members should be formed and structured.
¶ 25. On February 15, 2006, Evans sent Cagle a revised term sheet, changing the terms to increase Cagle’s capital contribution to pay for additional needed changes to Rig 12. Evans therein emphasized that “in no way will I reduce my partnership interest below 51% and/or mortgage my equipment and rig.”
¶ 26. On February 24, 2006, a law firm in Colorado sent the initial draft of an operating agreement for Laredo to Cagle, who then sent it to Evans. That draft stated that “S. Levon [sic] Evans, Jr. Operating, Inc., a Texas Corporation” would contribute equipment, and Reed Petroleum would contribute a promissory note for $7 million. The terms were not consistent with Evans’s agreement as discussed in the January term sheet or in the revised February term sheet. Evans stated that when he asked Cagle about the operating agreement, Cagle said he was planning to borrow against real estate that he owned. Evans claims Cagle never told him that he was planning to borrow against Rig 12. The February 24 draft authorized Laredo to grant a security interest in equipment to secure a member’s capital contribution, and it also required a super majority of sixty percent to borrow money or grant a security interest. According to Evans, he did not point out this inconsistency because he had written the term sheets saying what he wanted done. On March 3, Carroll sent the revised February term sheet to the Colorado attorney who was involved in drafting the operating agreement.
¶27. Evans claimed he did not learn that Rig 12 had been mortgaged until the summer of 2006, after Cagle had granted the security interest. The Baker Defendants submitted evidence to counter that assertion. According to the Baker Defendants, Evans obtained an appraisal of Rig 12 in January 2006, prior to the LBK loan closing. The appraisal report confirmed that the “function of the appraisal is for collateral use in obtaining financing with a lending institution.” Cagle emailed Evans the loan documents more than a month before the loan closing, arguably showing that Rig 12 would be mortgaged. Evans claimed that he did not read these documents.
¶ 28. On March 7, the day before Cagle closed the loan mortgaging Rig 12, Evans’s employee Brian Bunnell requested information from the Baker Defendants regarding the “additional insured” for the rig. Carroll responded that LBK would be the additional insured and sent Bunnell the provision of the security agreement which, according to the Baker Defendants, showed that Rig 12 would serve as “collateral” for the “secured party,” which was LBK. Evans instructed Bunnell to obtain the insurance. And Bunnell provided the proof of insurance on March 8 — the day of Cagle’s loan closing.
¶ 29. According to Evans, adding payees or additional insureds on insurance policies was very common for Evans’s companies. Evans contended that Carroll’s email included only a short paragraph from the security agreement describing the insurance needed and did not reference Laredo and Rig 12 specifically. Evans also asserted that he had never discussed the LBK loan with Cagle, Held, or Carroll. No one had asked him for the title to Rig 12, to sign any loan document, or to go to the closing. And he never had signed a bill of sale or other document to transfer Rig 12 from E & D.
*398 ¶ 30. Evans claimed that the Baker Defendants had multiple opportunities to discuss the LBK loan with him, because they were discussing other matters involving Laredo during the time the loan was being structured.
¶ 31. The final loan documents showed that Cagle had signed the security agreement and promissory note as manager of Laredo and as manager for Reed Petroleum. Evans claimed he did not authorize Cagle to sign on behalf of Laredo, and that he, Evans, did not sign anything regarding the LBK loan. Evans asserted that the Baker Defendants did not tell him about the closing or anything about the loan.
¶ 32. As mentioned previously, Evans claimed that he did not learn until the summer of 2006 that Rig 12 had been mortgaged. Evans continued to refurbish Rig 12 in the summer and fall of 2006 because he had signed binding contracts to drill. According to Evans, Heartland was not paying its bills. And since workers and vendors still had to be paid, the only way Evans could pay the bills, refurbish Rig 12, and comply with his drilling obligations was to borrow money on Rig 11.
¶ 33. According to Evans, he sought legal advice about financing from the Baker Defendants, who recommended Draw Works Investments, LLC (Draw Works) to Evans, and Held directed Carroll to do the loan. Draw Works agreed to loan $5 million to E & D, secured by Rig 11 and guaranteed personally by Evans. The default interest rate was twenty percent. E & D was a party to the Draw Works loan because it owned Rig 11. Draw Works had its own counsel, and Evans believed that he and E & D were represented by Baker & McKenzie, even though the Baker Defendants claim the only times they had represented Evans were for the three inquiries into Evans Operating’s dealings with Heartland.[3]
¶ 34. The Baker Defendants communicated with Draw Works about the loan. Evans claimed that both he and Mrs. Evans had signed the loan documents at Carroll’s direction. Draw Works’ attorney considered the Baker Defendants to represent Evans and E & D and, on August 23, 2006, wrote that when the documents are finalized, “you will obtain your client’s signature [i.e. Evans’s] on each of the documents .... ”
¶ 35. On August 8, 2006, Carroll allegedly told Evans that he needed to sign the Laredo operating agreement as a prerequisite for the Draw Works loan. According to Evans, Carroll did not tell Evans that Baker & McKenzie did not represent Evans or E & D, that Baker & McKenzie had a conflict, or that Evans should retain separate counsel; he also did not explain the Laredo operating agreement’s implications of the Rig 12 mortgage on Evans and his businesses. Evans signed the operating agreement on August 8, making it retroactive to March 6, 2006. The Draw Works loan closed on September 5, 2006.
¶ 36. In the fall of 2006, Evans and Cagle discussed an expansion of Laredo. Cagle proposed a “super-sized” Laredo by combining Evans’s and Cagle’s Texas operations into a single entity that owned Rig 11 and Rig 12. Cagle would use the “super-sized” Laredo to solicit a $100 million investment in their Texas drilling operations.
¶ 37. In October 2006, Cagle called a meeting with Evans and other potential partners in the Laredo expansion; the *399 meeting was held at Baker & McKenzie’s Dallas offices. Evans testified that Held attended and, for the first time, told Evans that Baker & McKenzie did not represent him or his companies and that it represented only Cagle and his companies. Evans claimed that, after the meeting, he offered to sell Cagle “everything [he] had in Texas” for $50 million so he could get out of this “mess,” and Cagle refused. The next day, Evans said he told Held how “unhappy” he was with Cagle because Ca-gle was rushing the Laredo expansion and was “running further and further behind on his bills.” According to Evans, Held encouraged him to “be patient,” reminded him that Cagle had always paid him in the past, and suggested that Cagle would pay what he owed. Held denied that he had any such conversations with Evans.
¶ 38. In the fall of 2006, the Baker Defendants formed two limited-liability companies using both Evans’s name and corporation name for wholly-owned subsidiaries of Laredo. On December 1, 2006, the Baker Defendants filed documents representing that Evans Drilling Ventures, LLC, was no longer a member of Laredo and that E & D, which owned Rig 12, was the new member of Laredo. According to Evans, the Baker Defendants did not obtain consent or permission from Evans or his separate counsel or take any action to comply with the requirements to change members of a limited-liability company. Evans never signed anything the Baker Defendants prepared after the October 17 meeting.
¶ 39. Ultimately, the Laredo expansion unwound, as did Cagle’s and Evans’s relationship. Evans testified the last straw came while he was drilling- a well for Heartland in December 2006. Cagle instructed a Laredo employee to wire the well-investors’ fund out of Evans’s account and into Cagle’s. Evans said he confronted Held about Cagle’s “unauthorized” wire transfers and Held allegedly told him to “be patient.” But Evans “had all he was going to put up with” in relation to Cagle.
¶40. Cagle, however, testified that he and Evans began operating pursuant to the planned Laredo expansion shortly after the October 2006 meeting. In anticipation of the expansion, Heartland loaned Evans money so that Evans could purchase an interest in drilling prospects, meet his companies’ payroll, pay off liens on Rig 11, and pay installments on the Draw Works loan. By Heartland’s estimate, these loans to Evans totaled almost $7 million. Cagle and Evans met in March 2007 to discuss repayment of the loans. Evans insisted that Heartland owed him money; Cagle disagreed and demanded that Evans repay the loans. Cagle testified that the March 2007 meeting “was really the beginning of the end of [the Laredo] merger and of our business relationship.” According to Cagle, Evans never repaid the loan money. The business relationship ended in April 2007, when Ca-gle attempted to wire $2,700,000 out of Evans’s Operating’s account in Laredo, Texas. Cagle testified that he had advanced Evans the money to purchase a prospect in Texas, but the deal fell through and Cagle was recapturing his funds. Evans saw the transfer as an attempt to use Evans’s money to pay Heartland’s debts. Evans stopped the transfer and would not return Cagle’s calls.
¶ 41. After Christmas 2006, Evans and his companies drilled no more wells for Heartland. In May 2007, Evans and his companies finished drilling a well for Heartland in Texas. When the drilling finished, Evans moved Rig 12 to a yard in Texas, where it was stacked. On May 11, 2007, Held wrote the yard where Evans had stacked Rig 12 and advised that neither Evans nor E & D had authority to *400 move, disassemble, or alter the rig. That same day, Draw Works gave notice that it was declaring its note in default, making the entire principal balance due with the interest accruing at the default rate of twenty percent.
¶ 42. During this time, HEI East OMG Joint Venture (OMG), one of Heartland’s joint ventures, sued Evans and his companies in federal district court, alleging that they had defrauded OMG out of $2.7 million. The district court granted summary judgment against Evans. In an unpublished opinion, the Fifth Circuit Court of Appeals reversed the district court, finding that there was a genuine dispute of material fact as to OMG’s fraud claim.
¶ 43. Meanwhile, Evans, Evans Operating, and E & D participated in mediation with Heartland. When mediation ended, Reed Petroleum and Laredo, represented by the Baker Defendants, filed suit in Texas state court (Texas court) against Evans and E & D for damages and possession of Rig 12. In the complaint, Baker stated that E & D was a member of Laredo, that Reed Petroleum was the controlling member of Laredo, and that Laredo had not signed an operating agreement. According to Evans, the Baker Defendants incorrectly stated in the complaint that E & D was a member of Laredo, that Reed Petroleum was the controlling member of Laredo, and that Laredo had not signed the operating agreement. The Baker Defendants also obtained a temporary restraining order (TRO) against Evans and E & D without notice to Evans or his counsel. The TRO stated that Evans wrongfully had moved and misappropriated Rig 12, and the TRO prohibited Evans from moving, dismantling, or altering Rig 12. Evans hired Texas counsel and, after a hearing, the Texas court did not renew the TRO and it expired. The Texas court also expressed concern about a possible conflict of interest, and the Baker Defendants withdrew as counsel.
¶ 44. On August 17, 2009, a bench trial was held in Texas court. The Texas court ruled that Laredo owned Rig 12, and Evans’s conduct had damaged Laredo by approximately $3.8 million. Thus, Reed Petroleum was entitled to approximately $1.8 million in damages, based on its forty-nine-percent share in Laredo. The court specifically found that Evans knew of and consented to the Rig 12 mortgage:
This case revolves around this Court’s findings regarding the operating agreement and the parties’ actions surrounding the agreement. Mr. Evans’[s] major contention is that he never intended to mortgage his Rig and Mr. Reed Cagle’s contention is that Mr. Evans knew at all times that he was borrowing money precisely on the Rig. While it is clear from the two proposals sent by Mr. Evans to Mr. Cagle on January 3, 2006 and February 14, 2006 that Mr. Evans did not want to mortgage his equipment, Mr. Evans’[s] actions, knowledge, and consent over the course of six months clearly gave Mr. Cagle the authority to encumber Rig 12. More importantly, Mr. Evans knowing full well that the Rig was already encumbered, ratified the actions taken by Reed Cagle when he signed the final Operating Agreement on August 8, 2006 and making it retroactive to March 6, 2006.
¶ 45. In November 2008, Evans and his companies (Plaintiffs, herein) sued the Baker Defendants, Laredo, and its subsidiaries, Evans Operating Texas and E & D Services, in Jones County, Mississippi. Plaintiffs asserted seven causes of action in the complaint. They charged the Baker Defendants with legal malpractice and breach of contract, and all of the defendants with breach of fiduciary duty, negligent omission and misstatements of *401 material facts, civil conspiracy, tortious interference, and breach of the duty of good faith and fair dealing. In January 2009, Defendants Laredo, Evans Operating Texas, and E & D Drilling Services (Cross-Plaintiffs), filed a cross-claim against the Baker Defendants in the Jones County Circuit Court, claiming legal malpractice; breach of contract; breach of fiduciary duty; and breach of duty of good faith and fair dealing.[4]
¶46. The jury returned a verdict of $103,400,000 in actual damages for Plaintiffs and Cross-Plaintiffs. Evans was awarded $1 million from defendant Joel Held and $30 million from Baker & McKenzie. Evans Operating was awarded $1 million from Joel Held and $29 million from Baker & McKenzie. E & D was awarded $1,000,000 from Joel Held and $19 million from Baker & McKenzie. The trial court reduced the $31 million awarded to Evans, individually, by the ten percent comparative-fault assessment determined by the jury. Laredo and its subsidiaries were awarded $22.4 million against Joel Held and Baker & McKenzie, collectively. A divided jury, nine jurors in favor of punitive damages and three jurors against, awarded $75,000 in punitive damages to Plaintiffs and $75,000 in punitive damages to Cross-Plaintiffs. Plaintiffs and Cross-Plaintiffs were awarded $12,566,348.79 in attorneys’ fees, which included an hourly-rate calculation plus a bonus fee equal to ten percent of the total verdict.
DISCUSSION
I. Whether the trial court erred in denying the Baker Defendants’ request to grant collateral estoppel to the factual findings and the judgment of the Texas litigation.
¶ 47. The trial court denied the Baker Defendants’ motion for a judgment as a matter of law that the Texas judgment should have been given collateral-estoppel effect in the Mississippi litigation. To succeed on a motion for a judgment as a matter of law, a party must prove that “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact.”[5] This Court reviews the denial of a motion for a judgment as a matter of law de novo.[6]
¶ 48. The Baker Defendants argue that, if the Jones County Circuit Court had given the Texas court’s ruling preclusive effect, Evans could not have proven that Baker’s malpractice caused his losses.
¶ 49. This Court reviews the issue of collateral estoppel under a de novo standard of review.[7] The doctrine of collateral estoppel is used to preclude parties “from relitigating the specific issues actually litigated, determined by, and essential to the judgment in a former action, even though a different cause of action is the subject of the subsequent action.”[8] The *402 parties do not have to be the exact parties that litigated the former action; instead, if the nonparty can prove that he was in privity with the parties in the former action, then collateral estoppel may be applied.[9] For a nonparty to be considered in privity, the nonparty must be “connected with [the former action] in their interests [and be] affected by the judgment with reference to interest involved in the action, as if they were parties.”[10] Even if the nonparty is considered to be in privity, the issues must be “the specific issues actually litigated.”[11]
¶ 50. This Court has made clear that:
in the absence of passing technical muster of the previous action involving identical parties, identical legal issues, and the same facts required to reach a judgment, it cannot be applied. And, even where it arguably meets a technical muster, “the rule is neither mandatory nor mechanically applied.”[12]
¶ 51. The trial court refused to give the Texas ruling collateral-estoppel effect because the Baker Defendants were not in privity with any party in the Texas case, and the issues in the two cases were not identical.
¶ 52. The Texas court ruling states in relevant part:
This case revolves around this Court’s findings regarding the operating agreement and the parties’ actions surrounding the agreement. Mr. Evans’s major contention is that he never intended to mortgage his Rig and Mr. Reed’s contention is that Mr. Evans knew at all times that he was borrowing the money precisely on the Rig. While it is clear from the two proposals sent by Mr. Evans to Mr. Cagle on January 3, 2006 and February 14, 2006 that Mr. Evans did not want to mortgage his equipment, Mr. Evans’s actions, knowledge and consent over the course of six months clearly gave Mr. Cagle the authority to encumber Rig 12. More importantly, Mr. Evans knowing full and well that the Rig was already encumbered, ratified the actions taken by Reed Cagle when he signed the final Operating Agreement on August 8, 2006 and making it retroactive to March 6, 2006.
¶ 53. At no point did the Texas court address Baker & McKenzie’s alleged malpractice or Baker & McKenzie’s relationship with Evans. The trial court correctly found that the cases involved different issues, because the Texas court did not address Baker & McKenzie’s connection with the Texas case.
¶ 54. The Baker Defendants misconstrue the findings of the Texas court. The Texas court simply found that Evans had ratified the actions of Cagle causing the encumbrance of Rig 12 when Evans signed the operating agreement on August 8, 2006. The Texas court did not find that Evans had knowledge of the mortgage of Rig 12 at all times. In the Jones County action, Plaintiffs’ theory of liability was that the Baker Defendants had a duty to inform Evans of the mortgage of Rig 12 before it was finalized. The Texas issue dealt with Evans’s knowledge of the mortgage at the time the loan was closed or by ratification some time after the loan was made.
*403 ¶ 55. The specific issues in the Mississippi action were not litigated in the Texas action. Therefore, the trial court was correct in denying the Baker Defendants’ motion for collateral estoppel of the claim. The discussion of privity is not necessary because the specific issues litigated in the Texas action were not the same as those at issue in the Mississippi litigation.[13]
II. Whether the Baker Defendants were entitled to a judgment notwithstanding the verdict.
¶ 56. The Baker Defendants argue that they are entitled to judgment notwithstanding the verdict (JNOV) because the Texas court’s findings are entitled to collateral-estoppel effect and those findings preclude Evans from establishing causation. Also, reasonable jurors could not have believed that Evans did not know about or consent to the mortgage of Rig 12.
¶ 57. When we review a denial of JNOV, “we consider the evidence in the light most favorable to the non-moving party, and give that party the benefit of all favorable inferences that may be reasonably drawn from the evidence.”[14] If, after giving all favorable inferences to the non-moving party, the facts “point so overwhelmingly in favor of the party requesting the JNOV that reasonable persons could not have arrived at a contrary verdict, we will reverse and render.”[15] But “[i]f there is substantial evidence to support the verdict we will affirm the denial of the JNOV.”[16] “‘Substantial evidence’ is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions.” [17]
¶ 58. The Baker Defendants contend that the evidence presented to the jury was overwhelming that Evans knew about the mortgage. According to the Baker Defendants, Evans received and read the email and the attached draft operating agreement, both confirming Cagle’s intent to pledge Rig 12 as collateral. Additionally, Evans had Rig 12 appraised prior to Cagle’s loan closing for the purpose of “collateral used in obtaining financing with a lending institution.” And lastly, Bunnell, Evans’s employee, was asked to name LBK as an additional insured and was provided the security agreement showing that Rig 12 would serve as collateral.
¶59. The evidence that supported the jury’s finding of liability was substantial. The single copy of the draft of the LBK loan documents that Baker and Cagle sent Evans did not mention Laredo, Rig 12, or any company in which Evans owned an interest. Furthermore, Evans claimed he told both Cagle and the Baker Defendants repeatedly that he would not mortgage Rig 12. The Baker Defendants never obtained any written or verbal authorization or consent from Evans regarding the security *404 interest in Rig 12. Neither Evans nor Laredo received the loan proceeds from LBK. Significantly, Rig 12 was seized in May 2007 as a result of litigation instituted by the Baker Defendants on behalf of Ca-gle. Although Rig 12 was released in June 2007, Laredo and Evans by then lacked sufficient capital to operate it, which resulted in the rig sitting idle and rusting for several years. The lack of capital came from lost business opportunities, debts, and liens resulting from an inability to use Rig 12. Additionally, Harry Allen, expert witness for Laredo, testified and confirmed that the Baker Defendants’ multiple breaches of professional and fiduciary duties caused the loss of Rig 12.[18]
¶ 60. According to the Baker Defendants, Evans’s malpractice claims rest on the servicing agreement transaction and the Laredo joint venture; they argue that the Plaintiffs’ theory that the Baker Defendants’ “course of conduct,” and not a particular transaction, led to the injury is improper. The Baker Defendants assert that transactional legal-malpractice claims must be based on a particular transaction. According to the Baker Defendants, for Plaintiffs to prevail on their transactional-malpractice claims, they must link particular transactions to actual losses. The Baker Defendants label all other claims as “peripheral.”
¶ 61. This categorization by the Baker Defendants is incorrect. First, this is not a transactional legal-malpractice action, but rather a legal-malpractice action based on conflict of interest and breach of fiduciary duty. Evans did not present the jury with the theory that the Baker Defendants’ malpractice was limited to the servicing agreement transaction, the Laredo joint venture, and other peripheral claims. Instead, Evans’s assertion was that the Baker Defendants
interjected themselves into Evans’s businesses from 2001 through 2007 advising him to enter the servicing agreement, representing him in Mississippi and Alabama proceedings, advising him on business dealings with Heartland and Reed Petroleum, advising him on the structure of Laredo and its subsidiaries, and representing him in connection with the Rig 11 loan.
¶ 62. In order to prove a legal-malpractice claim based on allegation of breach of fiduciary duty, the plaintiff must establish “(1) the existence of an attorney-client relationship; (2) the acts constituting a violation of the attorney’s fiduciary duty; (3) that the breach proximately caused the injury; and (4) the fact and extent of the injury.” Crist v. Loyacono, 65 So.3d 837, 842-43 (Miss.2011). Plaintiffs and Cross-Plaintiffs submitted sufficient evidence that a jury could find that an attorney-client relationship existed between the Baker Defendants and both Evans and Laredo; the Baker Defendants violated their fiduciary duty to Evans and Laredo and thereby caused injury to both Evans and Laredo.
III. Whether the Baker Defendants were subject to personal jurisdiction in Mississippi.
¶ 63. The Baker Defendants argue that the Jones County Circuit Court did not have personal jurisdiction and, therefore, the judgment should be reversed and remanded for a dismissal without prejudice.[19] This Court reviews the issue of personal jurisdiction under a de *405 novo standard.[20] For this Court to properly address the issue of personal jurisdiction over the nonresident Baker Defendants, we must “first consider whether the long-arm statute subjected a nonresident defendant to personal jurisdiction and then ... consider whether the statute’s application to that defendant offends the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.”[21]
¶ 64. The applicable portion of Mississippi Code Section 18-3-57 states:
[a]ny nonresident person ... who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the court of this state.[22]
In Sorrells v. R & R Custom Coach Works, Inc.,[23] this Court stated that “Mississippi’s long-arm statute contains no requirement that the part of the tort which causes the injury be committed in Mississippi when the injury results in this state.”[24]
¶ 65. Plaintiffs and Cross-Plaintiffs argue that the Baker Defendants committed a tort against Evans and his companies, who are all residents of this state. As laid out in greater detail in the fact section, the Baker Defendants represented Evans and Evans Operating for the 2001 and 2005 Mississippi Secretary of State subpoenas and the Alabama inquiry. The Baker Defendants concede this fact but state that those matters are not at issue under the malpractice claims Plaintiffs and Cross-Plaintiffs raised. On its face, that assertion is true. But the tortious act occurred while Baker was defending Evans in the 2005 Mississippi Secretary of State inquiry. During that time, Baker also was drafting documents for the mortgage of Rig 12.
¶ 66. On three separate occasions, Evans or his representative spoke to Jon Carroll, a Baker & McKenzie attorney, about Baker’s representation. On March 3, 2006, Carroll and Evans spoke about the servicing agreement, yet Carroll did not mention the mortgage of Rig 12 by LBK or the fact that it directly contradicted the February term sheet Evans had sent him. On March 7, Evans’s employee Bunnell conversed via email with Carroll about adding an additional insured to an insurance policy. Although Carroll mentioned that LBK was a “loss payee,” he never disclosed who LBK was or that LBK had a lien on Rig 12. The email conversations did not include the entire security agreement, which could have told Evans who LBK was; the communications did not state that Laredo was mortgaging Rig 12 through LBK; and they did not disclose that Reed Petroleum was using Rig 12 as collateral for a loan. On August 8, 2006, Carroll was negotiating and finalizing Evans’s loan with Draw Works, which would use Rig 11 as collateral. Evans testified that Carroll instructed him to sign the Laredo operating agreement as a prerequisite for the Draw Works loan, and Carroll did not inform him that signing the *406 operating agreement would constitute ratification of the LBK loan.
¶ 67. The Baker Defendants had numerous opportunities to inform Evans about the LBK mortgage of Rig 12, yet failed to do so. The Baker Defendants argue that they represented Evans Operating only in the three inquiries, yet they failed to inform Evans, as per the engagement letter, that there was a potential conflict or that they did not represent him until October 2006. Instead, they used the relationship they had formed while representing Evans during the nonrelated inquiries and built on it for their other client’s benefit.
¶ 68. This Court also must address whether the application of the long-arm statute to the Baker Defendants offends the Due Process Clause of the Fourteenth Amendment. The United States Supreme Court has stated that:
due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with such that the maintenance of the suit does not offend the “traditional notions of fair play and substantial justice.”[25]
To ensure due process of law, a court must consider “(1) the extent and quality of the contacts of the defendant with the forum state and, assuming sufficient minimum contacts exist, [and] (2) whether the maintenance of the suit in the forum state offends traditional notions of fair play and substantial justice.”[26]
¶ 69. Under the requirement for minimum contacts, the contacts must not be simply “fortuitous,” and they “must be between the defendant and the forum state, not simply between the defendant and a resident of the forum state.”[27] Plaintiffs met this standard because the record shows that the Baker Defendants represented Evans during both inquiries by the Mississippi Secretary of State. Additionally, Held, who agreed to represent Evans in Mississippi, traveled to Mississippi to review Plaintiffs’ records in preparation for responding to the 2001 subpoena and undertook all the obligations of representation under Mississippi law. Held also represented Evans again in the 2005 Mississippi Secretary of State inquiry. At that same time, the Baker Defendants were drafting the LBK loan documents, knowing that Evans would not agree to the mortgage of Rig 12.
¶ 70. To determine if the suit offends traditional notions of fair play and fair justice, the Court considers:
the burden on the defendant, the interests of the forum [s]tate, and the plaintiffs interest in obtaining relief. It must also weigh in its determination “the interstate judicial system’s interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.” [28]
*407 For the Baker Defendants to defend this action in Jones County Circuit Court, the burden was minimal. Baker & McKenzie is one of the largest law firms in the world and has the means to defend itself in a jurisdiction in which it has purposefully availed itself of the benefits or protections of Mississippi law.
¶ 71. The Baker Defendants were subject to personal jurisdiction in Mississippi under the long-arm statute. Their due-process rights were not violated because they met the requisite minimum-contacts requirements, and personal jurisdiction did not offend traditional notions of fair play and substantial justice. This issue is without merit.
IV. Whether the trial judge’s comments influenced the jury and prejudiced the Baker Defendants.
¶ 72. The Baker Defendants contend that certain comments made by the trial judge during voir dire and during the direct examinations of Joe Held and Gran-ville Tate constitute grounds for reversal. We, however, find this issue waived.
¶ 73. Based on our review of the record, at no point did the Baker Defendants make a contemporaneous objection to any of the complained-of comments. The record shows only that the Baker Defendants moved for a mistrial at the conclusion of Tate’s testimony, on the ground that their expert, Tate, “was not afforded the same treatment as the plaintiffs expert.”
¶ 74. This Court has been clear on contemporaneous objections: failure to make a contemporaneous objection at trial generally waives an issue for the purposes of appeal.[29] More specifically, “in order to obtain a review of the question of propriety of remarks or conduct of the trial judge during a trial, the remarks must be especially called to the attention of the trial judge when made, and a correction requested or a proper objection made at the time.”[30] Accordingly, the Baker Defendants’ failure to make a contemporaneous objection renders the issue procedurally barred. Further, in the absence of a contemporaneous objection from defense counsel, there is no ground for a mistrial.
V. Whether the trial court properly denied the Baker Defendants’ verdict forms D-8a and D-9a.
1175. A trial court’s decision regarding jury instructions is reviewed for an abuse of discretion.[31] If the jury instructions, taken as a whole, “fairly, but not necessarily perfectly, announce the applicable rule of law, no error results.”[32] If the jury instruction is not supported by the record, the trial court should deny the instruction.[33]
¶ 76. The Baker Defendants offered jury instruction D-13, which stated:
The Court instructs you that fault must be apportioned among all of the participants in an occurrence which gives rise to a lawsuit, including participants that have not been named as defendants in this lawsuit. Therefore, if you award any damages to the Plaintiffs, *408 you should apportion the total damages award among all persons or entities whose conduct proximately contributed to those damages, according to that person’s or entity’s share of fault and regardless of whether that person or entity is a party to this lawsuit.
This instruction was accepted.
¶ 77. The Baker Defendants also offered D-8a and D-9a, which were verdict forms allowing the specific apportionment to Plaintiffs, Cross-Plaintiffs, the Baker Defendants, and Cagle. Instruction D-8a required the jury first to answer if Evans or his companies proximately contributed to the damages and, if so, to what percent. The fifth question on the verdict form asked the jury to answer if Cagle, personally, was the proximate cause of Plaintiffs’ damages, and if so, question six asked to what percent. Instruction D-9a asked the same questions of the jury, but instead of questions pertaining to Evans or his companies, they addressed whether Cross-Plaintiffs, acting through Evans or others, were guilty of any fault which was a proximate cause of the alleged damages to Cross-Plaintiffs.
¶ 78. The trial court denied instructions D-8a and D-9a based on the objection(s) from Plaintiffs and Cross-Plaintiffs concerning the sequence of findings to be made by the jury. Under the respective verdict forms offered by the Baker Defendants, the jury first would determine Plaintiffs’ and Cross-Plaintiffs’ fault before deciding whether the Baker Defendants were liable and whether any fault should be assessed to Cagle. Plaintiffs and Cross-Plaintiffs argued that, because Mississippi Code Section 11-7-15 directs the jury to “diminish” damages for the plaintiff “in proportion to the amount of negligence attributable to the person injured,” the jury must first determine the plaintiffs’ damages. The trial court stated:
I don’t have any problem with the instruction except what defendants [sic] we start off with. We’re starting off finding that the plaintiff here — the plaintiff is entitled to know whether or not the jury finds that there is any liability on that — on the part of what they allege against Baker. But we’re starting off here — we’re trying to find out what part of the fault, if any, if the plaintiff is involved with here. I don’t understand starting off with that premise [sic] whenever if we go to the first question, which I’ve always asked, do you find any liability on the part of the defendant instead of starting off with the plaintiff.
¶ 79. Our trial courts enjoy considerable discretion regarding the form and substance of jury instructions. Splain v. Hines, 609 So.2d 1234, 1239 (Miss.1992). Our concern on appeal is simply that “the jury was fairly instructed and that each party’s proof-grounded theory of the case was placed before it.” Id. There is no Mississippi rule with regard to the chronological order of jury instructions themselves or their content. Though, as the Baker Defendants point out, the sequence of findings (or order of questions) in proposed verdict forms D-8a and D-9a track the language and sequence provided by Mississippi Practice Model Jury Instructions Civil Section 11:9. It reads, in part:
1. Do you find from a preponderance of the evidence that the plaintiff, _ [name of plaintiff], was guilty of any negligence (fault) which was a proximate contributing cause to_[his or her] own injuries?
_ Yes
_ No
Mississippi Judicial College, Mississippi Model Jury Instructions, Civil, § 11:9 (2006). We point out that the model jury instructions are only guidelines and have not been adopted by this Court. And in *409 any event, we think the trial judge must have the discretion to modify a model charge when necessary so that it conforms with the facts, circumstances, and law that apply to the case being tried.
¶80. Here, however, we fail to see the problem with the form of either D-8a or D-9a as to the order of findings. Technically speaking, asking a jury first to determine whether a plaintiff was guilty of fault which was a proximate cause of his or her damages should not matter. If there is fault, there is fault. And if the jury is fairly and properly instructed on the law and in turn so applies that law to the facts presented, the outcome should be the same regardless of who is first mentioned.
¶ 81. The trial court nonetheless saw it differently and ordered that the sequence of questions be changed. Ordinarily, under the above rationale, we would not hold the trial court in error for simply having a problem with the form of these respective instructions and requiring they be revised accordingly. But as we think the following colloquy illustrates there was confusion in the trial court’s directive.
THE COURT: Okay. What part of D-8 is it you have a [problem with].
MR. NELSON [counsel for Plaintiffs]: Well, my problem is it ... [i]t puts the cart before the horse. I read the law of comparative fault to require a finding of liability first and reduce that liability by comparative fault.
I do agree with the concept, Your Honor, that Your Honor needs to charge the jury on comparative fault. That’s the law of the state. We [acknowledge that. We think this particular charge could be worked out if we had — it’s also covered by the — apportionment of fault is clearly set out in the model charges, which this deviates from dramatically.
MR. DUNBAR [counsel for the Baker Defendants]: Can I be heard on that one?
THE COURT: All right.
MR. DUNBAR: Yes, sir. I think it’s pretty obvious that this is exactly what is routinely given in state and federal courts in terms of the form. I would ask the [c]ourt to seriously consider this one as the special verdict form.
I would also like [to] add, if it’s helpful, that the [Court’s instruction in this case does not have a proximate cause portion which I would suppose would be—
[[Image here]]
THE COURT: Do /all have any objections if I put this — I mean, do you have any objections to the instruction as far as the statements of the instruction as far as the substance of the instruction if it’s placed in the right order? Maybe that’s what I’m trying to say.
MR. NELSON: I think we could live with that if it goes in the right sequence of events.
THE COURT: Then redo it the way you want it done and I’ll look at it in the morning at 8:30. In the meantime it will just be passed.
¶ 82. The next morning, the following discussion occurred:
THE CLERK: They’re replacing D-8a for D-8 yesterday.
[[Image here]]
THE COURT: Did I pass on it yesterday?
MR. DUNBAR: Yes, sir.
THE COURT: Did I tell you to [...] revise it?
MR. DUNBAR: Yes, sir.
THE COURT: What did you revise about it then?
*410 MR. DUNBAR: You told us to take out the part after paragraph.
THE COURT: Did you do that?
MR. DUNBAR: I did, sir.
THE COURT: Do you have any objections?
MS. MCDONALD [counsel for Plaintiffs]: No, Your Honor.
THE COURT: Be given.
MR. DUNBAR: It’s exactly the same for D-9. D-9a is the change you told us to make by removing parts of it.
THE COURT: Has that been done?
MR. DUNBAR: Yes, sir.
THE COURT: Do you have any objections?
MS. MCDONALD: No, Your Honor.
THE COURT: Be given. What else?
MR. DUNBAR: That’s it I believe for us, Your Honor.
[[Image here]]
MR. BEST: The defendants submitted D-9, their special verdict form, yesterday in which the Court rejected because it started out with the plaintiffs’ fault first. And Your Honor asked us to get together and try to agree on a special verdict form.
We revised our DCP-5 in accordance to accommodate the defendants’s objections. We put the fault of the defendants first. Then we put judgment over.
And we offered [sic] to them. We said, if you want to add your special verdict form questions number one and two thereafter in the order that the judge requested, that’s agreeable to us except that where it said S. Lavon Evans and others, we ask that it be put and/or his companies. And they have refused our proposal. So my position is there is no contributory negligence charge before the [c]ourt that has been granted thus far as to the cross-plaintiffs’ claims.
MR. DUNBAR: I need the [c]ourt to be clear that I don’t want to mislead. The [c]ourt just gave DCP-9, which is the cross-plaintiffs — D-9. And I would like ... the [c]ourt to be aware that the instructions I did present removed only the part that exited [sic] after 100 percent to the plaintiff. It’s in the same order as it was yesterday because the [c]ourt had told us that that was the verdict form that you were used to giving starting with — it does start with the plaintiff. I don’t want the [c]ourt to believe that I moved that. Just making that representation.
MR. BEST: Judge, my notes from yesterday say, D-9 — your words — denied for now. You all get together and try to agree. I met with them this morning—
THE COURT: Well, I should have known that y’all weren’t going to agree on anything to start with.
¶ 88. Ultimately, instructions D-8a and D-9a were refused. Given the facts and circumstances of this case, these instructions were significant, and they should have been given.
¶ 84. In Mississippi Valley Silica Co., Inc. v. Eastman, 92 So.3d 666 (Miss.2012), this Court reiterated that “where an instruction relates to a central feature of the case and where there is no other instruction before the court which treats the matter, it is error to refuse an instruction on the grounds that ‘it has been inartfully drawn.’ ” (Quoting Thomas v. State, 278 So.2d 469, 472 (Miss.1973)).
¶ 85. This case was tried on multiple theories of liability, and the jury was instructed on the elements for each. But the jury was not asked to decide on which claim(s) caused the Plaintiffs’ and/or *411 Cross-Plaintiffs’ damages.[34] And all that we can say, based on the record evidence before us, is that any one of these claims— whether to the exclusion and/or inclusion of one of the other/s) — could have led to the complained of injuries. Thus, we find that the evidence at trial supported an allocation of fault to either Plaintiffs, Cross-Plaintiffs, the Baker Defendants, or Cagle. And this triggered Mississippi’s comparative fault law and required a verdict form permitting an allocation of fault to each. Miss.Code Ann. § 85-5-7 (Rev. 2011). The verdict forms proposed by the Baker Defendants, which would have permitted an allocation of fault to said individuals and/or entities, were refused without explanation by the trial judge. This was reversible error.
VI. Whether the trial court erred in granting Cross-Plaintiffs’ jury instruction D-CP 5.
¶ 86. The Baker Defendants also assert that the verdict form Cross-Plaintiffs submitted, which was adopted by the court, was an improper peremptory instruction on liability.[35] The D-CP 5 instruction stated:
1. We, the jury, find for Cross-Plaintiffs, Laredo Energy Holdings, LLC and its subsidiaries, against Defendants, Joel Held and Baker & McKenzie, LLP, and assess actual damages in the amount of $_
2. If you awarded damages in favor of Plaintiffs against Laredo Energy Holdings, LLC and its subsidiaries, do you find for Laredo Energy Holdings LLC and its subsidiaries, against Defendants, Joel Held and Baker & McKenzie LLP, and assess all damages awarded in favor of Plaintiffs and against Laredo Energy Holdings, LLC and its subsidiaries against Defendants, Joel Held and Baker & McKenzie, LLP.
_ Yes
_ No
¶ 87. We find that the trial court erred by not sustaining the Baker Defendants’ objection to jury instruction D-CP 5. The Baker Defendants are correct that the instruction should have contained qualifying language, such as the phrase “if you find”. But we are concerned more with the whole instruction itself, when read in conjunction with D-CP 4. D-CP 4 stated:
Plaintiffs have made claims for damages against Laredo Energy Holdings, LLC and its subsidiaries. If you find for the Plaintiffs and award any damages against Laredo Energy Holdings, LLC and its subsidiaries, Laredo Energy Holdings, LLC, and its subsidiaries seek judgment over and against Joel Held and Baker & McKenzie to the full extent of any damages award to the Plaintiffs because they claim that all such damages were caused by the fault of Joel Held and Baker & McKenzie.
¶ 88. The following arguments were made to the trial court with regard to DCP 4:
*412 MR. BEST: Next one is [D-CP 4] which is our claim for judgment over and against Baker [&] McKenzie to the extent any claim in favor of the plaintiffs and against Laredo we have put into evidence. Our position through our experts that essentially our claim is that Laredo was high jacked by the Baker [&] McKenzie. That means if Laredo is liable — if the jury agrees and finds that Laredo is liable to the plaintiffs and enters judgments against us on the plaintiffs’ conspiracy claim, we’re seeking judgment over and against Baker for those damages. And this is the pertinent instruction to explain that contention to them.
[[Image here]]
MR. DUNBAR: Your Honor, ... we would object to this. What they’re trying to do is create apparently a cause of action in Mississippi for judgment over and against when the law would be indemnity claims. This would be a common law indemnity claim. And this instruction does not include the elements necessary to create a common law indemnity claim nor does it — and this would also be required that any member of Laredo must be completely faultless for them to have a common law indemnity. They could be one percent at fault and it would absolutely bar an indemnity claim in the State of Mississippi.
This is also confusing, supplemental to my argument, because this case is going to be fraught with potential — I imagine we’re going to hear arguments tomorrow, hopefully not, that will result in a double dipping of damages as between the Evans’ plaintiffs and ... Laredo. And this is certainly going to cause that potential problem.
¶ 89. We agree that D-CP 4 constitutes an indemnity instruction. And, based on the facts of this case, we find that Cross-Plaintiffs were not entitled to it.
¶ 90. As set forth in Bush v. City of Laurel, 215 So.2d 256, 259-60 (Miss.1968), the basis for an indemnity claim is as follows:
An obligation to indemnify may arise from a contractual relation, from an implied contractual relation or out of liability imposed by law. When one person is required to pay money which another person in all fairness should pay, then the former may recover indemnity from the latter in the amount which he paid, provided the person making the payment has not conducted himself in a wrongful manner so as to bar his recovery.
In J.B. Hunt Transport, Inc. v. Forrest General Hospital, 34 So.3d 1171, 1174-75 (Miss.2010), we explained:
Two critical prerequisites are generally necessary for the invocation of noncon-tractual implied indemnity in Mississippi: (1) The damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) it must appear that the claimant did not actively or affirmatively participate in the wrong.
(Quoting Home Ins. Co. v. Atlas Tank Mfg. Co., 230 So.2d 549, 551 (Miss.1970)) (emphasis in original). Hunt added:
It should be noted that as a general rule, in the absence of an express contractual or statutory right to indemnity, a party may bring an action for common-law indemnification only if he or she is without fault. Common-law indemnity is not a fault-sharing mechanism.... One who is him or herself at fault is not due indemnity, because liability for indemnity exists only when the party seeking indemnity, the indemnitee, is free of fault and has discharged a debt that should be paid wholly by the indemnitor.
Id. at 1174 (quoting Indemnity, 41 Am. Jur.2d § 21 (2005)). Mississippi recog *413 nizes a narrow exception to this rule, allowing recovery between tortfeasors only when one party is liable merely “because of passive negligence in failing to remedy the defect or because of a non-delegable statutory duty.” Id. (quoting Bush, 215 So.2d at 260). We find no such exception here.
¶ 91. Again, this case was tried on active-negligence and/or intentional-tort claims. Plaintiffs claimed, inter alia, throughout the case that Baker & McKenzie and Laredo (i.e., Cagle) conspired to destroy Evans and his companies. And counsel for Cross-Plaintiffs even alluded to this charge during his cross-examination of Koerber, as illustrated by the following exchange:
Q. Now, finally, sir, on the issue of damages to Laredo. You understand that Laredo in this case is a defendant as well as a cross plaintiff against Baker [&] McKenzie?
A. Yes, sir.
Q. And you understand that Mr. Evans seeks judgment against my client, Laredo, on claims of conspiracy and misrepresentation and tortious interference?
A. Yes, sir, that’s what I’ve read in the complaint.
Q. I know you’ve been here for some of the trial but I don’t know if you’ve been here the whole time. Let me ask you to assume that Mr. Evans when he testified said that Laredo was the instrument which Baker [&] McKenzie and its attorneys used to destroy him and his companies.
From a damage standpoint to Laredo, if you accept that that’s true and a judgment is entered against Laredo on that basis, would that be an additional item of damages that Laredo has sustained ....
¶ 92. We know of no authority in this state which would provide rights of indemnity in favor of an actively or intentional tortious LLC, based upon the conduct of one of its minority members. With instruction D-CP 4, the jury was provided a misrepresentation of Mississippi law. And when read in conjunction with D-CP 5, the instruction very likely could have prompted the jury to not award damages against Laredo — not based on the evidence, but rather based upon a path of least resistance. Moreover, as predicted by counsel for the Baker Defendants, instruction DCP 4 almost certainly led to duplicative damages — as will be discussed below in Issue VIII.
¶ 93. This instruction, along with D-CP 5, and the exclusion of instructions D-8a and D-9a, unfairly prejudiced the Baker Defendants.
VII. Whether evidence of Evans’s other companies was properly excluded in determining liability.
¶ 94. At trial, the Baker Defendants proffered evidence that Evans had shifted his business operations to new companies, which were owned by his wife Pam Evans, and used those companies to continue his oil and gas business and earn “millions of dollars.” The trial court excluded this evidence. The exclusion of evidence is reviewed for an abuse of discretion.[36]
¶ 95. The Baker Defendants argue that “Evans pursued a single damages theme: the Baker Defendants had ‘destroyed’ his business and left him ‘destitute,’ lacking all possessions] and resources.” This evidence arguably was offered to counter that theme and show that Evans had mitigated his losses. According to the Baker Defendants, the exclusion of the evidence pre *414 vented them from showing that Evans had not been forthcoming about his financial state and had, in fact, hidden his true financial condition from the jury.
¶ 96. Prior to trial, Plaintiffs sought to exclude this evidence under Mississippi Rules of Evidence 401, 402, 403, and 404. Plaintiffs argued that these companies were established after Evans’s dealings with the Baker Defendants had ended, therefore making them irrelevant to the malpractice action currently before the trial court. Additionally, Plaintiffs asserted that admission of the evidence would cause delay and confusion because of the extensive evidence that would be required to explain to the jury about those businesses and how they were separate from the businesses that were part of the lawsuit before them.
¶ 97. Mississippi Rule of Evidence 401 states: ‘“Relevant Evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”[37] Evans’s creation of, involvement in, or profits from businesses he created after his dealings with the Baker Defendants ended is not a “fact that is of consequence” in determining if the Baker Defendants breached their fiduciary duty owed to Evans.
¶ 98. But, as -will be pointed out in the next assignment of error, this evidence was relevant on the issues of damages.
VIII. Whether the jury’s $100,525,000 damages verdict is contrary to the credible evidence and a product of jury confusion, entitling the Baker Defendants to a new trial.
¶ 99. The Baker Defendants argue that the jury’s award of $100,525,000 in damages was contrary to the weight of the evidence presented at trial, and they contend that the trial court erred when it refused to grant a new trial based on the damages awarded. Alternatively, the Baker Defendants submit that a remittitur should be granted, with Plaintiffs’ expert Jim Koerber’s $44 million figure as the ceiling on damages potentially recoverable by Plaintiffs. The Baker Defendants contend that the disparity between Evans’s damages assessment and Koerber’s shows that the jury was prejudiced and/or confused by the evidence.
¶ 100. We agree with the Baker Defendants, at least in part, that the jury was confused by the evidence. But because we are reversing the judgment based upon the errors we find regarding the jury instructions addressed in Issues V and VI, we will address the problems we find with the damages issue in general so as to prevent them from recurring on remand.
¶ 101. The jury in this case completed two verdict forms — one for Plaintiffs’ recovery and one for Cross-Plaintiffs’ recovery. The jury awarded Plaintiffs $81 million and Cross-Plaintiffs $22.4 million. The jury allocated the $81 million among the Plaintiffs, giving $31 million to Evans individually, $30 million to Evans Operating, and $20 million to E&D.
¶ 102. The jury was presented evidence concerning damages from both Evans and Koerber. Koerber testified on behalf of Plaintiffs and Cross-Plaintiffs (Laredo), who also were a defendants in the matter. The jury also heard from Tom Grantham, Baker & McKenzie’s expert.
¶ 103. Evans testified that his businesses were worth approximately $50 mil *415 lion in the spring of 2007, but their aggregate value had plummeted to negative $31 million by the time of trial. Koerber, on the other hand, testified that Plaintiffs’ damages totaled approximately $44 million. And Koerber testified that Cross-Plaintiffs damages totaled $22.4 million ($400,-000 of which resulted from legal expenses Laredo incurred in the Texas litigation). During closing arguments, counsel for Plaintiffs asked the jury to return a verdict of at least $81 million, and counsel for Cross-Plaintiffs asked for $22.4 million.
¶ 104. Koerber reached his assessment of Plaintiffs’ damages by looking at three areas: loss of revenue-producing assets (Rig 11, Rig 12, and other equipment); accounts receivable due from the Cagle companies; and legal fees. Koerber calculated that the loss of revenue-producing assets was $30,328,613; the loss of accounts receivable, $11,404,699; and the legal fees incurred as a result thereof, $2,314,161. Evans, however, based his damages assessment on his net worth pri- or to and after the conduct of Defendants. His assessment differed from Koerber’s in that it took into account assets and liabilities that Koerber did not take into' consideration in his damages assessment.
¶ 105. The problem we find with Evans’s assessment, based upon the record evidence before us, is that we are unable to determine exactly what assets and/or liabilities are material to the harm caused by the Baker Defendants. A number of exhibits listing various assets and liabilities were entered into evidence. Evans explained how some of the assets and liabilities were related, but not all. And his expert, Koerber, merely acknowledged the exhibits themselves, some of which Koer-ber compiled; but, Koerber did not attest to the items or numbers contained therein with regard to the damages claimed by Evans.
¶ 106. Koerber’s damages assessment, for all intents and purposes, is supported by the evidence. But it allows for double recovery. According to Koerber, his total estimate for Plaintiffs’ damages was adjusted for the fact that Evans had only a fifty-one percent interest in Laredo, which owned Rig 12. The fifty-one percent interest amounted to $11,220,000, as Rig 12’s full value was assessed at $22 million. In other words, because Koerber opined that Cross-Plaintiffs’ damages were $22 million and Plaintiffs’ damages (in relation to Rig 12) were $11,220,000, total damages for Rig 12 amounted to $33,220,000.
¶ 107. Now, this would appear be a simple problem that could be dealt with mathematically — i.e., deducting $11,220,000 from Koerber’s overall damages assessment with regard to Rig 12. But the problem is compounded by the fact the jury found Evans, individually, ten percent at fault in this case. And this raises a questionable scenario. If Koer-ber’s $22 million damages assessment for Laredo was left in place, which would require reducing Evans’s damages assessment by $11,220,000, would not the jury’s ten-percent fault assessment against Evans be usurped and create a windfall for Evans based upon his interest in Laredo? But, if Evans were apportioned the $11,220,000 from Koerber’s damages assessment for Plaintiffs, would this not improperly divest Laredo of its damages assessment?
¶ 108. Our response to this conundrum is this: It should not happen again on remand.
¶ 109. Also, even though we find no merit in Defendants’ contention that the trial court erroneously excluded evidence of Evans’s other companies on the question of liability, we find this evidence is relevant in relation to the alleged harm *416 caused to Plaintiffs by the Baker Defendants.
IX. Whether the trial court erred by automatically submitting the issue of punitive damages to the jury.
¶ 110. The Baker Defendants argue that the trial court failed to follow the proper procedure under Causey v. Sanders[38] for submitting the issue of punitive damages to the jury for determination. In Causey, this Court stated:
If the jury awards compensatory damages, then an evidentiary hearing is conducted in the presence of the jury. At the close of this second phase of the trial, via an appropriate motion for directed verdict, the judge, as a gatekeeper, then ultimately decides whether the issue of punitive damages should be submitted to the trier-of-fact (jury).[39]
¶ 111. The trial court met the first requirement of Causey when it conducted the hearing. The Baker Defendants assert that the trial judge’s comments that he “let the jury deal with it” was an automatic ruling that the jury should determine punitive damages. We agree that this was an improper ruling by the trial court. Nevertheless, at the conclusion of the punitive-phase closing arguments, unlike in Causey, the Baker Defendants did not move for a directed verdict or in any way object, and the punitive-damages claims were submitted to the jury. And we find that Plaintiffs and Cross-Plaintiffs offered sufficient evidence that the Baker Defendants had “demonstrated a willful or malicious wrong or the gross, reckless disregard for the rights of others” during the compensatory phase, and they incorporated that evidence via motion during the punitive-damages phase.[40]
¶ 112. Rule 61 of the Mississippi Rules of Civil Procedure states:
No error in either the admission or the exclusion of evidence and no error in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
This Court has stated multiple times, “No trial is free of error; however to require reversal the error must be of such magnitude as to leave no doubt that the appellant was unduly prejudiced.”[41]
¶ 113. We agree that the trial court erred in not making a finding at the conclusion of the evidentiary hearing to submit the issue of punitive damages to the jury. Nevertheless, at the end of the punitive phase, the Baker Defendants failed to move for a directed verdict or object to the issue of punitive damages being submitted to the jury. Additionally, Plaintiffs and *417 Cross-Plaintiffs submitted sufficient evidence to support punitive damages. The error of the trial court was harmless. Because we are reversing for a new trial on damages the error should not recur again on remand.
X. Whether trial court’s $12,500,000 attorneys’ fee award is excessive and reversible.
¶ 114. Because we are remanding this case for a new trial on damages, we decline to address this issue.
CONCLUSION
¶ 115. For the foregoing reasons, we affirm the judgment of the trial court on the issue of the Baker Defendants’ liability. We reverse the court’s judgment concerning damages and remand the case to the Jones County Circuit Court for a new trial on proximate cause and damages. The new trial shall allow whatever evidence is necessary, under the rules, to be presented so that the parties may fairly present and defend their claims accordingly-
¶ 116. AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
WALLER, C.J., DICKINSON, P.J., LAMAR AND COLEMAN, JJ., CONCUR. KING, J., CONCURS IN PART WITHOUT WRITTEN OPINION. RANDOLPH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, CHANDLER AND KING, JJ.

. Evans testified that he sought Held's advice on numerous occasions between January 2002 and October 2006. Evans admitted that none of the advice was in writing.

. On average, Heartland paid Evans between $600,000 and $700,000 every month. And in many months, Heartland paid more than $1 million. The Evans operating balance sheets do not show any payment in the exact amount of $200,000. And there is no evidence that Cagle ever invoked the servicing agreement as a reason for not paying Evans.

. 2001 Mississippi Secretary of State subpoena; 2005 Alabama inquiry; 2005 Mississippi Secretary of State subpoena.

. Initially, both Evans and Cagle hired their own respective attorneys for Laredo. Evans's attorneys answered with a one-page general denial and filed a lengthy cross-claim against the Baker Defendants. Cagle’s attorneys filed a detailed answer and moved to dismiss the Evans Plaintiffs' lawsuit; they filed no cross-claims. The trial court struck Cagle’s pleadings and declared Evans’s counsel to be the "exclusive counsel” for Laredo.

. Miss. R. Civ. P. 56(c).

. Johnson v. St. Dominics-Jackson Mem'l Hosp., 967 So.2d 20, 22 (Miss.2007).

. Global Oceanic Enter. v. Hynum, 857 So.2d 659, 661 (Miss.2003).

. Marcum v. Mississippi Valley Gas Co., Inc., 672 So.2d 730, 732-733 (Miss.1996).

. Smith v. Malouf, 826 So.2d 1256, 1260 (Miss.2002).

. Little v. V & G Welding Supply, Inc., 704 So.2d 1336, 1339 (Miss.1997).

. Marcum v. Mississippi Valley Gas Co. Inc., 672 So.2d 730, 732-733 (Miss.1996).

. Id. at 733 (quoting Jordan v. McKenna, 573 So.2d 1371, 1375 (Miss.1990)).

.Through their Appellants' Motion for Judicial Notice and to Supplement the Record on Appeal, filed with this Court on December 21, 2011, the Baker Defendants contend that a court filing by Plaintiffs in Texas federal court reveals that, after obtaining a judgment in the case sub judice, Plaintiffs took a contrary position with regard to the servicing agreement while litigating against Cagle in Texas. We find, however, that this alleged revelation has no bearing on our decision in this case. Thus, we deny the motion.

. Natchez Elec. & Supply Co., Inc. v. Johnson, 968 So.2d 358, 361 (Miss.2007) (citing Steele v. Inn of Vicksburg, 697 So.2d 373, 376 (Miss.1997)).

. Johnson, 968 So.2d at 361 (citing Steele v. Inn of Vicksburg, 697 So.2d at 376).

. Johnson, 968 So.2d at 361.

. Id. (citing Blake v. Clein, 903 So.2d 710, 731 (Miss.2005)).

. Damages are fully discussed infra.

. This Court denied the Baker Defendants’ interlocutory appeal on the issue of personal jurisdiction in November 2009. Baker & McKenzie, LLP v. Evans, 2009-M-01458-SCT (Miss.2009).

. Dunn v. Yager, 58 So.3d 1171, 1184 (Miss.2011).

. Estate of Jones v. Phillips, 992 So.2d 1131, 1137 (Miss.2008).

. Miss.Code Ann. § 13-3-57 (Rev.2012).

. Sorrells v. R & R Custom Coach Works, Inc., 636 So.2d 668 (Miss.1994).

. Id. at 672.

. Int’l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

. Estate of Jones v. Phillips, 992 So.2d 1131, 1140 (Miss.2008) (citing Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 113-115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

. Dunn v. Yager, 58 So.3d 1171, 1186 (Miss.2011) (quoting Admin. of Tulane Educ. Fund v. Cooley, 462 So.2d 696, 703 (Miss.1984)).

. Asahi Metal Indus., 480 U.S. at 113, 107 S.Ct. 1026 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

. Ross v. State, 954 So.2d 968, 987 (Miss.2007).

. Tippit v. Hunter, 205 So.2d 267, 271 (Miss.1967).

. Newell v. State, 49 So.3d 66, 73 (Miss.2010).

. Milano v. State, 790 So.2d 179, 184 (Miss.2001).

. Canadian Nat’l/Illinois Cent. R. Co. v. Hall, 953 So.2d 1084, 1102 (Miss.2007) ("Our case law is clear that jury instruction must be supported by the evidence.”).

. At one point during the jury-instruction conference, counsel for the plaintiffs had entered an objection to the Baker Defendants' proposed jury instruction D-2, which pertained to attorney/client relationships. Plaintiffs' counsel argued that it was confusing because the instruction said an attorney owes no duty to a non-client, which, according to Plaintiffs’ counsel, the Baker Defendants' "own expert even testified that there were duties owed to a non-client.” Plaintiffs' counsel added, "That’s certainly not the law.” To which the trial court responded, "Well, under your theory of the case, if he’s a non-client, then why are we here to start with?” Plaintiffs’ counsel replied, "We may sue him for misrepresentation, civil conspiracy.”

. See Miss. Farm Bureau Mut. Ins. Co. v. Todd, 492 So.2d 919, 927 (Miss.1986).

. Beverly Enters. v. Reed, 961 So.2d 40, 44 (Miss.2007).

. Miss. R. Evid. 401.

. Causey v. Sanders, 998 So.2d 393, 407 (Miss.2008).

. Id. (quoting Bradfield v. Schwartz, 936 So.2d 931, 939 (Miss.2006)).

. Causey, 998 So.2d at 408 (quoting Ross-King-Walker, Inc. v. Henson, 672 So.2d 1188, 1192 (Miss.1996)).

. Belmont Homes, Inc. v. Stewart, 792 So.2d 229, 236 (Miss.2001) (citing Davis v. Singing River Elec. Power Ass'n, 501 So.2d 1128, 1131 (Miss.1987); Parmes v. Illinois Cent. Gulf R.R., 440 So.2d 261, 268 (Miss.1983)).